**In the United States District Court
for the District of Kansas**

───────────

Case No.   19-cr-40040-TC

───────────

UNITED STATES OF AMERICA

v.

SHANE D. MCMILLIN

───────────

**MEMORANDUM AND ORDER**

Shane D. McMillin is charged with being a felon in possession of a stolen firearm, in violation of 18 U.S.C. § 922(g)(1) and § 922(j). Doc. 2. He now moves to suppress evidence of the firearms, arguing that they were found after law enforcement unreasonably prolonged his traffic stop in contravention of *Rodriguez v. United States*, 575 U.S. 348, 354–55 (2015). Doc. 42. Because police officers did not extend the stop beyond the time required to complete their traffic-related tasks, his motion is denied.

**I**

**A**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Searches and seizures—of people, their homes, and their personal property—are presumed unreasonable when conducted without a warrant. *United States v. Karo*, 468 U.S. 705, 717 (1984). But that does not mean that every warrantless search or seizure is unreasonable. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006); *Cady v. Dombrowski*, 413 U.S. 433, 447 (1973); *see also Scott v. Harris*, 550 U.S. 372, 383 (2007) (noting that "ensuring public safety" is "the paramount governmental interest"); *Georgia v. Randolph*, 547 U.S. 103, 118 (2006) (distinguishing between intrusions to investigate and to protect).

1

Traffic stops are seizures for Fourth Amendment purposes, *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015), yet warrantless stops are valid where the officer has reasonable suspicion to believe that a traffic violation occurred, *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020). "Reasonable suspicion" is "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). The inquiry depends on "the totality of the circumstances," *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *Cortez*, 449 U.S. at 417), and "requires . . . 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

But even stops based on reasonable suspicion of a traffic infraction will violate the Fourth Amendment if they are "prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). In other words, every traffic stop must be justified at its inception and must conclude once the traffic-related mission has been accomplished, unless officers develop reasonable suspicion of other illegal activity or the initial detention becomes a consensual encounter. *United States v. Gomez-Arzate*, 981 F.3d 832, 839 (10th Cir. 2020) (quoting *United States v. Cortez*, 965 F.3d 827, 833 (10th Cir. 2020)).

**B**

On February 13, 2019, Salina Police Department Officer Michael Baker and his drug-sniffing K-9 were on patrol in Salina, Kansas.[1] Baker saw Shane McMillin's blue pickup truck traveling on a city street. Baker knew McMillin and his truck and also knew, from a prior stop in December 2018, that the truck's temporary license plate had expired. Baker began following the truck, used radar to record it exceeding the speed limit by nine miles per hour, and then stopped the truck. At some point after Baker began following McMillin, and before initiating

---

[1] The parties presented evidence at a hearing on April 18, 2022. McMillin appeared in person and through counsel. The Court heard testimony from Officers Baker and Constantino and received into evidence two exhibits, Gov. Exs. 1 & 2, containing portions of the body cam and dash cam footage of McMillin's stop. The facts are largely undisputed, with the parties primarily disagreeing about their effect.

the stop, Baker used his radio to request that a back-up officer assist him with the traffic stop.

After Baker and McMillin had both come to a stop, Baker approached the truck and found McMillin and a female passenger inside. He obtained their identities, discussed the expired temporary tag with McMillin, and requested proof of insurance, which McMillin could not locate. As a consequence, Baker decided to cite McMillin for the failure to insure and register his vehicle.

Officer Gino Constantino arrived on the scene while Baker was still engaged in his initial discussion with McMillin and the passenger. When that discussion concluded, Constantino met with Baker, and the two officers spoke briefly at the rear of McMillin's truck. During that conversation, Baker asked Constantino to prepare the citation for both the lack of insurance and improper registration, as well as a warning for speeding, while Baker walked his K-9 around the truck. Before walking his K-9, however, Baker returned to the truck to obtain its VIN. Throughout the stop, Baker had been using his radio to provide information to dispatch, which ran searches to confirm that the occupants had no outstanding warrants. He did the same with the VIN, asking dispatch to confirm that the vehicle had not been reported stolen. This return information from dispatch came both by radio and by real-time updates to the computer system in Baker's and Constantino's patrol cars.

As was his usual practice when deploying his K-9, Baker instructed McMillin and his passenger to roll up the vehicle's windows, turn off the vehicle, and step out. He directed them to stand next to the front passenger headlight of the patrol car in which Constantino sat preparing the citations using his in-vehicle computer system. While Baker was directing them to this spot, dispatch returned a clear search on the VIN—the last information Constantino would have needed to fill out the citations.

Baker then took his K-9 to the truck. She alerted almost immediately, giving Baker probable cause to search the vehicle. During his search of the truck's interior, he located two handguns, ammunition, a digital scale, syringes, rubber tubing, and a "baggie of suspected methamphetamine." At that point, the focus of the stop shifted to the contraband, and Constantino never completed the traffic citations.

3

The K-9 alert occurred roughly eight minutes into the stop and about three minutes after Constantino began writing the citations. Constantino testified that traffic stops usually take approximately 15 minutes and that preparing the citation itself ordinarily takes between seven and eight minutes.

## II

McMillin alleges that the dog sniff violated the Fourth Amendment's prohibition against unreasonable seizures.[2] His position fails because the dog sniff was conducted during a lawful traffic stop and did not prolong the time needed to complete the mission of issuing a ticket for the traffic violations. *Rodriguez v. United States*, 575 U.S. 348, 350–51 (2015); *accord Illinois v. Caballes*, 543 U.S. 405, 409 (2005) (rejecting constitutional objection to drug sniff conducted by second arriving officer during lawful traffic stop).

Dog sniffs conducted during a lawful traffic stop are permissible unless they prolong the stop "beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Rodriguez*, 575 U.S. at 350 (cleaned up). Whether officers improperly extended a stop is a fact-intensive question. *United States v. Malone*, 10 F.4th 1120, 1124 (10th Cir. 2021). A stop is unlawfully extended when officers pursue unrelated activities that extend the stop beyond "when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 575 U.S. at 354; *see also United States v. Frazier*, 30

---

[2] McMillin does not argue that the dog sniff was an unreasonable search. *See* Docs. 43 & 45; *see also Illinois v. Caballes*, 543 U.S. 405, 408–09 (2005) (holding that exterior, open-air K-9 sniffs do not implicate privacy interests or constitute an unreasonable search). He does not challenge the legality of the stop. And he neither disputes that a valid K-9 alert gives probable cause to search a vehicle nor provides any evidence that the K-9 alert in this case was invalid.

F.4th 1165, 1173 (10th Cir. 2022).³ And while there is no de minimis exception to the rule, *United States v. Mayville*, 955 F.3d 825, 830 (10th Cir. 2020), the question is only whether "police diligently pursued the [traffic] investigation," *Rodriguez*, 575 U.S. at 354, and not whether they took the quickest route humanly possible to concluding the stop. *Mayville*, 955 F.3d at 827. Thus, courts are not to "second-guess the logistical decisions of officers so long as their actions were reasonable and diligently completed within the confines of a lawful traffic stop[] . . . because reasonableness—rather than efficiency—is the touchstone of the Fourth Amendment." *Id.*

Video evidence and testimony confirm that Baker and Constantino did not unreasonably extend McMillin's stop. They were efficient in collecting the information necessary to process the traffic citations that justified the stop, obtaining the names and addresses of the truck's occupants, checking McMillin's license, discussing with McMillin his traffic infractions, obtaining the truck's VIN, sharing with dispatch the collected information to run standard searches, and exercising discretion as to what citations to issue. These acts are within the heartland of tasks permitted during a lawful stop. *See, e.g.*, *Rodriguez*, 575 U.S. at 355–57 (citing, among others, *Delaware v. Prouse*, 440 U.S. 648 (1979)).

The officers then took the information obtained to begin the task of drafting and issuing citations. Baker delegated that task to Constantino while he walked his dog around the exterior of the vehicle. In *Caballes*, the Supreme Court held that one officer's act of conducting a dog sniff while another on-the-scene officer wrote citations did not violate the Constitution. *See Caballes*, 543 U.S. at 406–08. McMillin identifies no factual or legal basis for a different result here.

Baker deployed his K-9, which almost immediately alerted, *while* Constantino was in the process of writing the citations. Constantino

---

³ *Frazier* noted disagreement within the federal courts on whether an officer calling for a K-9 officer during a traffic stop violates *Rodriguez*. 30 F.4th at 1173 n.2; *see also Idaho v. Karst*, __ P.3d __, 2022 WL 1482038 at *1 (Idaho May 11, 2022) (applying *Rodriguez* to hold that officer impermissibly extended traffic stop when he took 19 seconds to contact dispatch and request a drug-dog unit). That disagreement is irrelevant to this dispute: Baker—the officer making the stop—had the K-9 with him and sent his request for backup before the vehicles came to a stop. That act did not delay accomplishing the mission of the stop. McMillin does not argue to the contrary.

testified, based on his experience and standard practices, that it would have taken him seven or eight minutes to fill out all of the necessary paperwork for the two citations and one warning. Yet the K-9 alert occurred less than three minutes after Constantino returned to his car to start that process. In other words, the dog sniff did not delay this process or extend the stop because by Constantino's estimate he would have needed at least four more minutes to complete the citations had the dog not alerted.

McMillin's contrary arguments are unavailing. First, McMillin argues that the initial conversation between Baker and Constantino delayed the traffic stop. Although Baker did spend roughly 24 seconds explaining to Constantino what citations were needed, that conversation occurred before dispatch had returned all the information needed for Constantino to complete the citations and release McMillin.[4] In other words, even if that conversation had not occurred, McMillin would not have been able to leave the scene any sooner. *Cf. United States v. Chavez*, No. 19-4121, 2021 WL 4438742, at *5 (10th Cir. Sept. 28, 2021) ("[T]he dog sniff did not unconstitutionally extend the stop . . . because it occurred while Trooper Gibbs properly awaited Defendant's criminal-history report from dispatch—a task related to Trooper Gibbs's traffic stop.").

Next, McMillin argues that Constantino had to divert his attention from his citation-writing efforts to monitor McMillin and his passenger while the pair was standing outside his vehicle. While Constantino testified that he did keep an eye on them, he also testified they stood in a location where watching them was easy and did not require him to stop writing the citations. More importantly, he testified that, during an ordinary, single-officer traffic stop, the citation-writing officer must always keep an eye on vehicle occupants—regardless of whether they are in or out of their car. Thus, any distraction caused by watching McMillin did not cause Constantino to take longer with the citations than would be ordinary for him. *Cf. United States v. Ramos*, 723 F. App'x 632, 637–38 (10th Cir. 2018) (requiring evidence about the amount of time "it takes a reasonable officer to complete … tasks" as the starting place for measuring whether tasks were impermissibly extended).

---

[4] Specifically, this conversation occurred after Baker provided dispatch with McMillin's information and before dispatch returned confirmation that McMillin had no current warrants.

6

In fact, video footage of the stop show Baker and Constantino working quickly and with great focus at all times. There is no indication in the footage or the testimony that Constantino wasted any time or encountered any delay in completing his tasks. And Baker and Constantino's conduct in this case was consistent with both standard procedure and standard timelines for ordinary traffic stops in their jurisdiction. *See Mayville*, 955 F.3d at 827; *cf. Ramos*, 723 F. App'x at 637–38.

McMillin's final argument is that the entire traffic stop was pretextual—that because of Baker's previous experiences with McMillin, he had always intended to investigate for potential drug crimes during the stop. *See* Doc. 43 at 5, 10. And, indeed, Baker testified that he quickly formed the intent to conduct a K-9 sniff test without any articulable suspicion and requested back-up specifically so that his K-9 activities would not delay the stop. But Fourth Amendment precedent does not permit an examination of Baker's subjective reasons for the stop, good or ill. *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011). Instead, the only question is whether the circumstances gave rise to an *objectively* reasonable suspicion of a traffic crime—which McMillin admits that they did—and whether that stop was conducted without impermissible extension for nontraffic activities—which the evidence shows that it was.

### III

For the foregoing reasons, the Motions to Suppress, Doc. 42, is DENIED.

It is so ordered.

Date: May 18, 2022            s/ Toby Crouse
                              Toby Crouse
                              United States District Judge